UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY C. SULLIVAN, ET AL., <br> Plaintiffs, <br> v. <br> SII INVESTMENTS, INC., <br> Defendant. | Case No. 18-cv-00666-SI <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> Re: Dkt. No. 7 |

Before the Court is plaintiffs' motion for a temporary restraining order and order to show cause re preliminary injunction. The Court held a hearing on the motion on February 16, 2018. For the reasons set forth herein, the motion is DENIED.

## BACKGROUND

Plaintiffs Timothy Sullivan and Frank Cuenca have worked in the securities industry for approximately two decades. Complaint, Dkt. No. 1 at ¶ 7; Amended Application for a Temporary Restraining Order ("Application"), Dkt. No. 7 at ¶ 8. Since 2008, plaintiffs have been registered stockbrokers ("registered representatives" or "reps") at defendant SII Investments, Inc., an independent brokerage firm ("broker-dealer"). *Id.*; Schaff Decl., Dkt No. 5 at ¶¶ 9-10. Plaintiffs worked for SII as independent contractors.[1] *Id.*

In August 2017, defendant announced that it was selling itself to another brokerage firm,

---

[1] Defendant notes that plaintiffs' Independent Contractor Agreement with defendant included an arbitration clause, stating that "all legal proceedings will be subject to arbitration before the [National Association of Securities Dealers, the precursor to the Financial Regulatory Authority ("FINRA")]." Dkt. No. 17 at 6:11-13. Plaintiffs do not dispute this assertion.

Linsco Private Ledger Financial ("LPL"). Dkt. No. 1 at ¶ 9. Following the announcement, defendant informed its stockbrokers, including plaintiffs, of the process through which clients would be transferred to LPL.[2] *Id.* at ¶ 10. Plaintiffs allege that defendant indicated its intent to send a letter "in early January [2018] telling the account holders that they would be moved to LPL and assigned a new rep" only if defendant SII did not know whether a stockbroker had elected to go to LPL. *Id.*

The Complaint alleges that in early November, defendant and LPL told plaintiff Sullivan that "LPL was not taking him." *Id.* at ¶ 11; Sullivan Decl., Dkt. No. 3 at ¶¶ 30-32. On December 7, another brokerage firm, Independent Financial Group LLC ("IFG"), offered to hire plaintiffs. Dkt. No. 1 at ¶ 11. On the same day, defendant terminated plaintiffs and filed a Form U5[3] indicating that the termination was "for cause." *Id.* at ¶¶ 11-12; Dkt. No. 7 at ¶ 33. Defendant notified plaintiffs of their termination the next day. *Id.* Defendant stated several reasons for terminating plaintiffs. Dkt. No. 7 at ¶ 27. As to Sullivan, defendant stated Sullivan had failed to disclose tax liens, failed to update a U4 Form, and used unapproved email. *Id.* As to Cuenca, defendant stated Cuenca had failed to follow firm procedure in submitting variable annuity transactions, failed to timely submit a customer complaint, and used unapproved email. *Id.*

When plaintiffs notified IFG of the U5 filing, IFG "put everything on hold" and eventually rescinded its offer to plaintiffs. Dkt. No. 1 at ¶ 14. Plaintiffs subsequently found another brokerage firm, IAA, and obtained an offer, under terms that were "markedly less attractive." *Id.* at ¶ 15.

---

[2] The Application states, and the Complaint alleges, that defendant laid out the following steps for transferring clients: (a) "For reps who elected to go to LPL, and were accepted, there would be a direct transfer of clients"; (b) "For those who were not going to LPL, they needed to inform SII. Once SII knew they were not going to SII, there **would be no direct transfer**"; (c) "SII would give the representatives not moving a reasonable time to make other arrangements"; and (d) "For those reps *as to whom SII did not know what they were doing*, a letter would be sent out in early January telling the account holders that they would be moved to LPL and assigned a new rep. If SII knew that the rep was not going to LPL, the letter would not be sent[.]" Dkt. No. 1 at ¶10; Dkt. No. 7 at ¶11 (emphasis original).

[3] FINRA requires brokerage firms to make information about a stock broker's departure from a firm and the reasons for the termination publicly available by filing a Form U5. Dkt. No. 1 at ¶ 12; Dkt. No. 5 at ¶¶ 18-21.

On January 2, defendant sent out the transfer letter to plaintiffs' clients. *Id.* at ¶ 11. The transfer letter told clients that "their accounts would be moved to LPL unless they 'opted out,'" and that they had until February 5 to submit the opt out forms. *Id.*; Dkt. No. 7 at ¶ 35. SII would then transfer accounts to LPL for clients who did not opt out.[4] Dkt. No. 7 at ¶ 35.

On January 30, 2018, plaintiffs filed their Complaint, alleging five causes of action: (1) injunctive relief compelling defendants: (a) to disburse plaintiffs' deferred compensation funds; (b) to "not transfer Plaintiffs' clients to LPL unless the clients specifically request it," or to delay the transfer for 30 days; and (c) to file an amended U5 to "delete[] any description that Plaintiffs were terminated for cause"; (2) breach of contract; (3) wrongful termination/bad faith breach; (4) interference with contract and prospective advantage; and (5) fraud. Dkt. No. 1 at ¶¶ 21-42.

On the same day, plaintiffs filed a motion for a temporary restraining order ("TRO") asking the Court to grant the injunctive relief requested in the Complaint.[5] Dkt. No. 7. Defendant SII timely filed an opposition to the motion for TRO on February 12, 2018. Dkt. No. 17. On February 14, 2018, plaintiffs filed a reply to defendant's opposition.[6] Dkt. No. 18.

## LEGAL STANDARD

"Injunctive relief is an extraordinary remedy that may only be awarded upon a clear

---

[4] At the hearing, defense counsel informed that SII has agreed to give plaintiffs' clients 60 days to notify defendant not to transfer their account to LPL. Plaintiff counsel argued that 60 days was not sufficient to prevent harm to plaintiffs because the statements made in the U5 filing would continue to interfere with transfer of plaintiffs' license.

[5] Plaintiffs' motion asks the Court to compel defendant: (a) to transfer the deferred compensation funds due plaintiff Sullivan by wire transfer; (b) to not transfer plaintiffs' accounts for thirty days; and (c) to amend the plaintiffs' Form U5 "pending the resolution of an arbitration claim that is being filed with FINRA contesting that termination." Dkt. No. 7 at 2:1-15; 13:22-14:2. At the hearing on February 16, 2018, the parties stipulated that the issue regarding funds due plaintiff Sullivan has been resolved.

[6] In their reply, plaintiffs admit that they seek the TRO to "open[] the door for Plaintiffs to receive an expedited hearing, thereby minimizing the time that the incorrect U5 is on the public record" pursuant to FINRA Rule 13804. Dkt. No. 18 at 2:1-4. Plaintiffs request the Court to take judicial notice of three documents: FINRA Rule 13804 (Exhibit A, Dkt. No. 20-1), and two examples of injunctive relief awarded in arbitration with FINRA (Exhibits B and C, Dkt. Nos. 20-2, 20-3). These documents appear to be part of the public record, and defendant has not disputed their authenticity. Accordingly, the Court takes judicial notice of Dkt. Nos. 20-1, 20-2, 20-3.

3

showing that the plaintiff is entitled to such relief." *Wachovia Sec., LLC v. Raifman*, No. C 10-04573 SBA, 2010 WL 4502360, at *4 (N.D. Cal. Nov. 1, 2010) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008)) (quotation marks omitted). In order to obtain a temporary restraining order or a preliminary injunction, plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted); *see also Jones v. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1099 (S.D. Cal. 2012) (standard for granting a temporary restraining order is similar to standard for granting a preliminary injunction). "Alternatively, the plaintiff may demonstrate that the likelihood of success is such that 'serious questions going to the merits were raised and that the balance of hardships tips sharply in the plaintiff's favor,' so long as the other two elements of the *Winter* test are met." *Fid. Brokerage Servs. LLC v. Rocine*, No. 17-CV-4993-PJH, 2017 WL 3917216, at *3 (N.D. Cal. Sept. 7, 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32, 1135 (9th Cir. 2011).

**DISCUSSION**

**I.     Likelihood of Success on the Merits**

Plaintiffs argue that the Court should compel defendants to "rescind the 'for cause' termination" because defendants did not make a "reasonable, independent assessment" in the U5 filing; the asserted grounds for termination were pretextual; defendants did not follow the proper procedure before filing; defendants' conduct was "a self-serving and predatory attempt to cripple plaintiffs in order to transfer their clients to LPL"; and plaintiffs have a probable likelihood of success on the merits. Dkt. No. 7, at ¶¶ 25-26, 33-34.

Defendant argues that plaintiffs have failed to show a likelihood of success on the merits because the content of the U5 filing is protected by absolute privilege, and because defendant filed Form U5 "with FINRA, pursuant to FINRA's rules, upon SII's termination of Plaintiffs." Dkt. No. 17 at 3:19-22, 5:14-15.

California state law defines a privileged publication to include one made in any "judicial

4

proceeding, . . . in any other official proceeding authorized by law, or . . . in the initiation or course of any other proceeding authorized by law . . . ." Cal. Civ. Code § 47(b). The official proceeding privilege extends to "statements made in quasi-judicial proceedings" as well as to "communication intended to prompt an administrative agency charged with enforcing the law to investigate or remedy a wrongdoing." *Hagberg v. California Fed. Bank FSB*, 32 Cal. 4th 350, 362 (2004). Protection under section 47 applies to "proceedings authorized by law that are reviewable by administrative mandate . . . ." *Kibler v. N. Inyo Cty. Local Hosp. Dist.*, 39 Cal. 4th 192, 202 (2006), *as modified* (July 20, 2006). U5 filings are protected under section 47 because FINRA is "an independent regulatory body" whose decisions "are reviewable de novo by the [Securities and Exchange Commission] and thereafter by the United States Court of Appeals." *Fontani v. Wells Fargo Investments, LLC*, 129 Cal. App. 4th 719, 730, 734-35 (Ct. App. 2005) (quoting *Hagberg v. California Federal Bank*, 32 Cal. 4th 350, 370 (2004)), *disapproved of on other grounds by Kibler v. N. Inyo Cty. Local Hosp. Dist.*, 39 Cal. 4th 192, 138 P.3d 193 (2006); *see also Adjian v. JPMorgan Chase Bank, N.A.*, 697 F. App'x 528, 530 (9th Cir. 2017) (finding that a U5 filing "was absolutely privileged under § 47(b)").[7]

Here, the Court finds that defendant's U5 filing is protected by absolute privilege under section 47. Plaintiffs contend that the statements made in the U5 filing have had "an incredibly destructive effect on both Plaintiffs' ability to work," and that the reasons for termination are "specious." Dkt. No. 7 at ¶¶ 25-31. However, plaintiffs argue not that the Form U5 is incorrect or erroneous, but rather that the statements in the Form U5 "had been known to SII for years" and that SII had taken no action on the reasons outlining the for cause termination. *Id.* at ¶¶ 26-31. These claims may well form a powerful part of plaintiffs' arguments about wrongful termination in their FINRA arbitration, but do not support a finding that they will succeed on the merits of their claim that this Court should order the U5 "rescinded," or prohibit transfer of their clients to

---

[7] The Second Circuit also has found that statements made on Form U5 are protected under absolute privilege. *Rosenberg v. MetLife, Inc.*, 493 F.3d 290, 291 (2d Cir. 2007) (citing *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 368 (2007) (finding absolute privilege because of "Form U-5's compulsory nature"; "its role in the [FINRA's] quasi-judicial process"; and "the protection of public interests")).

5

LPL. Accordingly, the Court finds that plaintiffs have neither shown they are likely to prevail on the merits nor raise a serious question going to the merits.

In their reply, plaintiffs argue that FINRA does not preclude plaintiffs from seeking a TRO from this Court pending arbitration with FINRA. Plaintiffs argue that if a TRO is issued, FINRA expedites the arbitration process from over a year long wait to a fifteen day wait for a hearing. Dkt. No. 18, at 2:5-3:27. Further, plaintiffs argue absolute privilege under section 47 does not bar a TRO because the section only bars damages, not equitable relief. *Id.* at 1:11-2:4.

Prior to arbitration the Court has authority to issue injunctive relief in the form of a TRO. *Smith Barney v. Burrow*, No. CVF08-0373 LJO GSA, 2008 WL 4426805, at *2 (E.D. Cal. Sept. 26, 2008) ("[P]arties to a pending arbitration may seek a temporary injunctive order from a court of competent jurisdiction even if another party has already filed a claim arising from the same dispute in arbitration . . . provided that an arbitration hearing on a request for permanent injunctive relief . . . has not yet begun.") (quoting FINRA Rule 13804(a)(1)) (quotation marks omitted). However, plaintiffs still must demonstrate that they are likely to prevail on the merits, which they have not done.

## II. Harm to Plaintiffs and Public Interest

Plaintiffs argue the termination for cause filing is "the kiss of death in terms of getting a new job and getting relicensed," and "constitutes irreparable harm." Dkt. No. 7 at ¶¶ 33, 34. Plaintiffs argue that transferring plaintiffs' accounts to LPL would cause irreparable injury to plaintiffs because "50-70%" of transferred clients are not likely to return to plaintiffs, and therefore plaintiffs will lose those clients. *Id.* at ¶ 23. Defendant argues that plaintiffs have registered with IAA, so the U5 filing did not cause irreparable harm, and that the public interest favors disclosure of the basis for plaintiffs' termination to protect customers. *Id.* at 5:20-6:5.

Here, the Court cannot conclude that plaintiffs are likely to suffer irreparable harm based on the record. Plaintiffs admit that IAA agreed to hire plaintiffs, albeit on "less attractive" terms than their previous offer from IFG. *See* Dkt. No. 1 at ¶ 15. Further, the Court finds that the U5 filing is an important mechanism for protecting customers and therefore serves the public interest.

6

1   Accordingly, the Court finds that even if the plaintiffs had raised a serious question going to the
2   merits, plaintiffs fail to meet the other requirements for granting a TRO in this instance. *See Wild
3   Rockies*, 632 F.3d at 1135 (finding that "serious questions going to the merits and a balance of
4   hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,
5   so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
6   injunction is in the public interest") (internal quotation marks omitted).

### III. Arbitration

Defendant argues that plaintiffs are bound under their contract with defendant, and through their registration with FINRA, to resolve any disputes in arbitration. Dkt. No. 17 at 6:1-22.

Under the Federal Arbitration Act ("FAA"), "agreements to arbitrate are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 932 (9th Cir. 2013). "That statute reflects an 'emphatic federal policy' in favor of arbitration," to ensure that "private arbitration agreements are enforced." *Ferguson*, 733 F.3d at 932 (quoting *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) (per curiam); *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1159 (9th Cir. 2013)).

Here, the evidence of record indicates that plaintiffs have agreed to arbitrate their dispute with defendant pursuant to FINRA rules.[8] *See* Dkt. No. 17 at 6, n. 7. In addition, the arbitration clause in plaintiffs' Independent Contractor Agreement is enforceable under the FAA. As such, plaintiffs must address their dispute with defendant through arbitration.

///
///

---

[8] During oral argument, plaintiffs' counsel indicated that plaintiffs filed an arbitration claim to FINRA on Monday, February 12, 2018.

7

## CONCLUSION

For the foregoing reasons, the Court DENIES plaintiffs' motion for TRO and order to show cause re preliminary injunction.

**IT IS SO ORDERED**.

Dated: February 20, 2018

_____
SUSAN ILLSTON
United States District Judge